239 So.2d 803 (1970)
Euel E. QUATES, Mrs. E.E. Quates Jenkins, Mrs. Flora E. Quates Smith, Slater Nelson Martin, Mrs. Vera C.J. Martin, Edward Slater Martin, Mrs. Johnnie Mae Martin Hall, and The Shelton Corp., Appellants,
v.
C.J. GRIFFIN and Wife, Mrs. Mellis B. Griffin, J.E. Stack, Jr., A.F. Chisholm, W. Calvin Wells (As Trustee) and Whitney National Bank of New Orleans, Appellees.
No. 45808.
Supreme Court of Mississippi.
June 1, 1970.
Rehearings Denied October 12, 1970.
*804 Brunini, Everett, Grantham & Quin, William Timothy Jones, John R. Hutcherson, Jackson, Minniece, Neville & Hamill, Meridian, Norman B. Gillis, Jr., McComb, for appellants.
Heidelberg, Woodliff & Franks, Luther M. Thompson, Jackson, Riddell & Dabbs, Quitman, for appellees.
PATTERSON, Justice.
This is an appeal by six of the lawful heirs of Mrs. M.E. Vinson from an adverse decree in a confirmation of title suit to sixty acres of land in Clarke County. The appellants claim an undivided 15/27ths surface interest and an undivided 5/144ths mineral interest in the subject lands. The appellees admit that Mrs. M.E. Vinson was vested with the entire surface interest of the land and an undivided 1/16th interest in the minerals at the time of her death. However, the appellees contend that they are the owners of the surface and mineral interests in question by virtue of deeds from two of the heirs of Mrs. M.E. Vinson and by adverse possession. The primary issue is one of cotenancy, ouster, and adverse possession.
Mrs. M.E. Vinson died on October 24, 1935 intestate. At that time she was vested with record title to the land in controversy and is the common source of title of the contestants. After an extensive hearing, the lower court adjudicated the defendants and cross-complainants to be the true owners of the contested interest by virtue of ouster, adverse possession, and laches. We reverse.
Mrs. Vinson was married four times. Of these marriages she had three children, Patrick O'Connor Quates and Florence Medora Quates by her first husband, and Alion Lott by her second husband. The children of Patrick O'Connor Quates, also grandchildren of Mrs. Vinson, Euel Quates, Evelyn Quates, and Flora Quates, are complainants in this suit. Florence Medora Quates married Peter Martin and to this union there were born four children, Alpha Martin, John Martin, Slater Martin and Dora Martin. Alpha Martin died intestate in 1961 leaving no issue. John Martin died intestate in 1958 leaving his widow, Vera Martin, a son, Edward Slater Martin, and a daughter, Johnnie Mae Martin, who are grandchildren of Flora Medora Quates Martin and great grandchildren of Mrs. M.E. Vinson. They are complainants in this suit as is Slater Martin, a grandson of Mrs. Vinson.
Dora Martin Tucker, the daughter of Florence Medora Quates Martin, conveyed her interest to Griffin, the defendant, as did the heirs of Alion Lott. The relationship of the complainants to Mrs. Vinson is undisputed. The suit is thus between the great granchildren and some of the grandchildren, as lawful heirs of Mrs. Vinson, and C.J. Griffin, the grantee in deeds from Dora Martin Tucker, a grandchild, and Mrs. A.L. Lott, the widow of Alion Lott, the son of Mrs. Vinson, who was joined therein by Daisy, Florence, and James, her children, who are grandchildren of Mrs. Vinson.
Mrs. M.E. Vinson acquired record title to the property by deed of January 11, 1928. However, this record discloses that she was in possession of the land from as early as 1924. Prior to moving upon the sixty-acre tract Mrs. Vinson resided upon other land in the community which was a mile or so to the west of that in question. All of the appellants were born in the Hebron Ridge community of Clarke County *805 where this land is located and spent some of their early years there, but all had permanently departed by the year 1919.
Since 1916 to the present the principal defendant, C.J. Griffin, has resided upon lands adjacent to those in controversy. He was a neighbor of Mrs. Vinson who moved onto the land in 1924 and remained there until her death in 1935. As a matter of fact, Griffin rented the land, according to the testimony of one witness, from Mrs. Vinson for about a year prior to its purchase. Several days after the death of Mrs. Vinson, Alion Lott conveyed to Dora Martin Tucker, his niece, a granddaughter of Mrs. Vinson, by quit claim deed dated November 2, 1935, all his right, title and interest in the east one-half of Mrs. Vinson's sixty-acre farm. On the same day Dora Martin Tucker conveyed by quit claim deed to her uncle, Alion L. Lott, a son of Mrs. Vinson, all the right, title and interest she had in the west one-half of the sixty-acre farm. Both deeds were filed for record on November 2, 1935. The circumstances surrounding the execution of these deeds is explained somewhat by the testimony of one of the daughters of Alion Lott who was present when the matter was discussed by her father and Dora, her cousin. She testified on cross-examination as follows:
A. Well, they [Dora Tucker and Alion Lott] were just a talking, and they said they didn't know where any of the other children was at, and they said, well, my daddy says, "Well, the only way I know to do this is you take this side and I will take this side, and I will make you a deed and you make me one."
* * * * * *
A. No sir, they didn't agree that they were the only ones that was supposed to own the place; they knew there were more heirs, but my daddy 
* * * * * *
A. Well, my daddy said, "I don't know about this", and he said, "I don't know where Conner's children is at", and he says, "But if you think it is all right, we will go ahead and do it", and so, that is what they did do.
After the exchange of deeds, Dora Tucker and her husband moved into Mrs. Vinson's home on the east one-half of the sixty acres. Alion Lott went into possession of the west one-half of the property and began building a small house thereon which was not completed due to his death.
Thereafter, on January 13, 1937, Mrs. Dora Tucker and her husband conveyed by warranty deed to C.J. Griffin the east one-half of the subject lands. This deed was filed for record on April 11, 1953, about sixteen years later.
Alion Lott died intestate prior to September 23, 1939, leaving his widow, Nonie, and three children, Daisy, Florence and James. On September 23, 1939, Nonie, Daisy and Florence conveyed by a quit claim deed the west one-half of the sixty acres to C.J. Griffin who filed this deed for record on April 18, 1940. Thereafter, on April 18, 1953, James Lott signed and acknowledged the original deed which was refiled for record on April 20 of that year.
Griffin took possession of the lands on the dates of the deeds and has maintained possession since that time. The acts of possession consisted of the paying of taxes, the removing of cross fences, the cutting of timber for the construction of a pond, the constructing of the pond, the filling in of gullies, and the improving of the pasture. In sum, his possession and acts of possession were commensurate with the actions of a person who considered himself to be the owner of the entire interest in the land. The possession was open, visible, and continuous for approximately thirty years prior to the filing of this suit.
Griffin testified that he thought he had a "good deed" and that he was not aware of *806 the heirs or their claims to the property. His use and acts of possession over the land were in accord with the normal agricultural practices of the area. The land was grazed by his cattle, the fences were kept in a good state of repair, the old Vinson home was repaired and occupied by Griffin's tenants continuously until about two weeks prior to this suit. However, on June 17, 1953, Griffin obtained a quit claim deed from the widow and children of Alion Lott for the purpose of strengthening his title, a pertinent portion of which is as follows:
This conveyance is made for the purpose of perfecting the title of said C.J. Griffin to above described property. All of the grantors herein are adults, are under no legal disability, and are the sole and only heirs at law of A.L. Lott, deceased. Grantors aver that the said A.L. Lott died prior to September 23, 1939 and the grantors further aver that Mrs. M.E. Vinson who formerly owned above described property died prior to November 2, 1935 and at the date of her death the said Mrs. M.E. Vinson left surviving her as her sole and only heirs at law, Mrs. Dora Tucker and A.L. Lott, both of whom were adults and that after the death of the said A.L. Lott the grantors herein were entitled to any interest which he may have had in above described property, by reason of the death of said Mrs. M.E. Vinson (Emphasis added).
This deed was promptly recorded. From the record it is obvious that the statements in the deed designating the heirs of Mrs. Vinson to be only Mrs. Dora Tucker and A.L. Lott was erroneous. Griffin explained his procuring of this deed by stating that he didn't remember it. The chancellor in his opinion surmised that some oil man probably told Griffin that he might need to do a little something to get the title in better shape.
The defendant does not contend that he made an investigation of the public records, or engaged an attorney to do so, to determine the status of the title. Neither did he make inquiry of any of the other residents of the area who testified that they knew that Mrs. Vinson was married several times and left heirs or descendants other than Dora Tucker and A.L. Lott who conveyed to Griffin. It was also established that the first wife of the defendant, with whom he lived for many years, was a native of the area and knew there were other Vinson heirs. Other witnesses testified that it was generally known in the community that there were other descendants of Mrs. Vinson. In fact, one witness testified that the defendant knew of this, but admitted on cross-examination that he had not discussed the matter directly with the defendant, but thought he knew the status of the Vinson estate as it was common knowledge. We think it not unfair to comment upon the obvious which would indicate that the slightest inquiry by Griffin of any of his lifelong associates or even his first wife, would have disclosed facts indicative of the status of the title. An inspection of the deed records would also have disclosed the record title to be in Mrs. Vinson and the next entry of record subsequent thereto would have disclosed the exchange of quit claim deeds between Mrs. Dora Martin Tucker and A.L. Lott, signifying quite clearly an estate situation which, if investigated, would have disclosed the true situation regarding the title.
The other claimants, the Quates and Martin grandchildren, had "left the country" prior to 1919. Mrs. Earl Ivy (Daisy Lott) testified that when Mrs. Vinson died, neither the Lotts nor Dora Martin Tucker knew where any of the other children resided. She had not seen Euel Quates between the early 1920s and 1967 and had not seen Evelyn and Flora Quates since they were infants. The record is devoid of any evidence that the appellants had actual knowledge of the occupancy and use of the land by Griffin. In fact, some of the appellants were not aware of their relationship to Mrs. Vinson, and being unaware of *807 the relationship were oblivious to any inheritance they might have been entitled to from her. The chancellor in his opinion did not find that the appellants had actual knowledge or the equivalent thereof, but rather based his opinion on "the absolute and total indifference, negligence, laches on the part of the complainants * * *," whereupon the appellants' bill of complaint was dismissed and title confirmed in the cross-complainant.
Feeling aggrieved, the complainants appeal and assign as error the action of the court in dismissing the complaint and in confirming title in the defendant. The phenomenon of long-departed heirs being enticed to return to their earlier haunts by the "smell of oil" is not unfamiliar in the law. The difficulty arising from the long absences oftentimes leaves a situation where the law cannot do exact justice. The balancing of the loss of title acquired by birthright with the gaining of it by adverse possession, which is the taking from one by operation of law and vesting in another, is not of easy solution. Land that was formerly in abundant supply and of little value was often the subject of loose trading with slight thought to the future, leading to legal difficulties not anticipated. In cases where future difficulties were feared the land was not thought to be worth the cost required for proper record investigation and the drawing of proper instruments to eliminate the problem. This case appears to be one of the above types.
The case of Peeples v. Boykin, 132 Miss. 359, 96 So. 177 (1923) formerly afforded a grantee who was a stranger to the title some comfort against unknown claimants since the recordation of an instrument purporting to convey the entire property gave notice to the world, including cotenants, of the claims of the grantee, and if followed by adverse possession for the statutory period, full title became vested in the adverse holder. This case, however, has been overruled in the much-discussed and controversial case of Nichols v. Gaddis & McLaurin, Inc., 222 Miss. 207, 75 So.2d 625 (1954), leaving a stranger grantee to the title, the almost impossible burden in cotenancy cases of affirmatively proving by clear and convincing evidence that the other cotenants out of possession had actual knowledge of his claim to the entirety of the property or as otherwise stated, the equivalent thereof.
The question arises as to what constitutes "the equivalent of actual knowledge." We doubt that an exact answer can be given to the question and feel that the nearest approach to an answer would be the act of placing of record, in a public office designated for that purpose, a solemn instrument, a deed, which by its terms proclaims to the world the nature of the grantee's claim. It is the opinion of this writer that such a monument of law would have the effect of lending stability to titles and give true meaning to the underlying thought of limitation statutes as being those of repose. We are aware that this might require a cotenant to check the record against the possibility of another cotenant holding adversely at least once in every decade. However, we think this is not an intolerable burden when compared with the uncertainty of title brought about by the possible existence of unknown heirs.
The above recitations are made with the thought that they might receive legislative attention. The legislature, with the duty of enacting laws which are beneficial to the state and its citizens, and which meets periodically, has the opportunity to enact laws not afforded a court since a court cannot raise questions beyond the pleadings and must await a proper case upon its docket before corrections can be made, sometimes years. Meanwhile, the instability of title remains, perhaps for generations.
This case is not one in which the Court can reconsider the overruling of Peeples, supra, as we are convinced from the record that the defendant cannot be lawfully designated a stranger to the title. We must therefore, under stare decisis, follow the *808 law and reverse the case, feeling that under its facts no injustice will result.
The first issue to be determined is whether Griffin became a cotenant with the complainants by his purchase from two of the other cotenants. In Wilder v. Currie, 231 Miss. 461, 473-474, 95 So.2d 563, 566, (1957) we stated:
Mrs. Fox, as stated, owned only a one-half undivided interest and, of course, that was all she conveyed to Mr. Currie, although the deed purported to convey the entire title. The deed only conveyed what she had. * * * "One who purchases or obtains by conveyance the undivided share of a tenant in common becomes a cotenant with the remaining owner or owners."
See also Bush v. Quinn, 236 Miss. 895, 900-901, 112 So.2d 231, 232 (1959), wherein this rule was reannounced as follows:
* * * Elvira Quinn only had title to one-thirteenth undivided interest in the land and she conveyed to Bush only that undivided interest. Under this conveyance, Bush became a tenant-in-common with the twelve children of Mitchell Quinn, Sr., deceased. * * *
Thereafter, we quoted with approval from 14 Am.Jur. 90, par. 20, the following statement:
"A person regularly deriving title from one cotenant will be regarded as a tenant in common of the property with the other co-owners * * *" 236 Miss. at 901, 112 So.2d at 232.
From these authorities we are of the opinion that Griffin by his purchase from Dora Martin Tucker and the heirs of Alion Lott became a cotenant with the remaining heirs of Mrs. Vinson.
Griffin contends, however, that he purchased as a stranger to the title, without knowledge of the other heirs, and that his visible possession of the land thereafter necessarily raises a presumption of actual knowledge on the part of the cotenants out of possession. He cites in discussion and support of this position the cases Eastman Gardiner v. Hinton, 86 Miss. 604, 38 So. 779 (1905); Howard v. Wactor, 41 So.2d 259 (Miss. 1949), a tax title suit; Hurst v. J.M. Griffin & Sons, Inc., 209 Miss. 381, 46 So.2d 440 (1950); and Huddleston v. Peel, 238 Miss. 798, 119 So.2d 921 (1960), a case involving the inception of limitation period as to severed minerals, which we have examined and determined to be not applicable, though persuasively argued, to the present situation. In our opinion the slightest inquiry by Griffin of his neighbors, his wife, or a perusal of the deed records of the county, would have disclosed the title to be in an estate or cotenancy situation, and we think this particularly true with regard to the west portion of the property which was procured by quit claim deed. Howard, supra. In Craft v. Everett, 237 Miss. 360, 367-368, 115 So.2d 133, 136 (1959), though an estoppel case, we commented upon the failure of a vendee to inspect the records, stating:
One view concerning the juristic position of a vendee or mortgagee who omits to inspect the records is that `his ignorance, if it exists, is wilful, and he acts at his peril.' The preferable theory, however, is that the omission of an intending purchaser or mortgagee to investigate the state of the title of the property in question constitutes negligence on his part. * * *
Similarly, in Collier v. King, 251 Miss. 607, 611, 170 So.2d 632, 634 (1965), this principle was reannounced:
And equity will not, on the mere ground of silence, relieve one who is perfectly acquainted with his rights, or has the means of becoming so, by examining the land records or otherwise. * * *
Though the latter case is also one concerned with the question of estoppel, we are of the opinion that both cases correctly portray the rule that a purchaser may not *809 discount the knowledge afforded him by the record with the explanation that he did not look. In Howard v. Wactor, 41 So.2d 259, 261 (Miss. 1949) we stated:
The deed from Willie Howard to Andrew Zimmerman conveyed only "all of our right, title and interest" when Zimmerman purchased this land from Willie Howard. He had notice from the public records that Andrew Howard was the owner and Andrew being dead, at the time, he was charged with constructive notice of whether or not Andrew left a will; if not, who were the heirs at law; and whether the debts of the deceased had been paid. * * *
The general rule might be summed up by a statement from 28 Am.Jur.2d, Estoppel and Waiver, section 96, p. 750 (1966) as follows:
The propriety of according to the holder of an undisclosed interest the protection of the doctrine of constructive notice is an a fortiori conclusion in a case where it appears that the circumstances were such as to put the other party on inquiry as to facts ascertainable by an examination of the records. In such a case the other party is deemed to be affected with notice not only of the particulars which the records would have disclosed, but also of any additional particulars concerning which he might have acquired information if he had followed up the investigation in the manner and to the extent that would have been suggested to a prudent person by the contents of the records themselves.
From these authorities and the facts presented it is our opinion that Griffin was not a stranger to the title and his position is exactly the antithesis of that set forth in Reed v. Bales, 240 Miss. 592, 128 So.2d 374 (1961). In this case the Court determined Bales to be a stranger to the title, but it is noted that he was a remote purchaser from the cotenant, he was not a resident of the area, he hired an attorney to investigate the records, he planted thousands of tung trees on the acreage purchased, and constructed an expensive home thereon. These facts, which include reasonable investigation, clearly distinguish this case from the one at bar where there was no pretense of investigation. The "false deed" procured by Griffin, though not dispositive of the issue since it was obtained subsequent to the passage of the ten-year statute of limitations, has some merit, we think, in the overall consideration of the case as it indicates that he had lingering doubts as to whether his grantors were the only heirs of Mrs. Vinson and discredits somewhat, we think, his statement that he relied solely upon the statements and deeds of the heirs of Alion Lott and those of Dora Martin Tucker when he purchased from them. Cf. Guiseppe v. Cozzani, 193 So.2d 549 (Miss. 1966). We are of the opinion Griffin was a cotenant in fact as well as at law.
This Court is committed to the rule that the relation of a cotenant, not a stranger to the title, to the other cotenants is that of a fiduciary. This leads to the presumption of law that the acts of a cotenant in possession are for the benefit of, and not contrary to, the interests of cotenants out of possession. This rule is stated in Nichols v. Gaddis & McLaurin, Inc., 222 Miss. 207, 221, 75 So.2d 625, 629 (1954) as follows:
Because of the mutuality of their interests, possession and obligations, the relationship between cotenants is confidential and fiduciary in nature. Each has a duty to sustain, or at least not to assail, the common interest, and to sustain and protect the common title. It is a relationship of trust and confidence between co-owners of property * * *.
The foregoing rule does not foreclose completely the concept of adverse possession, that is, the gaining of title by one cotenant from another cotenant by adverse possession, but there is imposed upon the cotenant, claiming in the entirety, the affirmative burden of establishing by clear and *810 convincing evidence an ouster of the other cotenants. In Bush v. Quinn, 236 Miss. 895, 901-902, 112 So.2d 231, 233 (1959) we stated:
The rule which one cotenant must meet in order to oust a fellow-cotenant has been stated by this Court in these words: "In order to establish ouster of cotenants by a tenant in common in possession, the cotenants out of possession must have notice of his adverse claim either `from actual knowledge or as is sometimes vaguely expressed, by acts equivalent thereto', as by conduct so unequivocal that knowledge on the part of the cotenant out of possession must be necessarily presumed. Hurst v. J.M. Griffin & Sons, Inc., 1950, 209 Miss. 381, 46 So.2d 440, 442, 47 So.2d 811. The Hurst case further holds: `The testimony of such knowledge by the other tenants in common must be clear and convincing. Fox v. Wilkins, 201 Miss. 78, 28 So.2d 577. It is not enough that the possession to convey title should be apparently adverse but must be such with actual notice to the co-tenants or shown by such acts of repudiation of their claim as are equivalent to actual notice to them.'"
To the same effect see Gavin v. Hosey, 230 So.2d 570 (Miss. 1970).
The remaining question, there being no contention that the claimants had actual knowledge of Griffin's claim, is whether the acts of possession by Griffin were the equivalent of actual knowledge. Griffin's possession for approximately thirty years can only be characterized as including every act of ownership that would normally be practiced by an actual owner on rural lands of this character. It included the payment of taxes, the improvement of the pasture, the repair of the houses, the repair and removal of fences, the cutting of timber for the construction of a pond, the construction of the pond, the grazing of cattle upon the land and maintaining tenants on the property. However, these acts are also those which are entirely consistent with the lawful acts of possession which may be exercised by a cotenant in possession. In sum, the acts were not inconsistent with a cotenancy. The burden was upon Griffin, if he is to prevail in this suit, to prove an ouster by clear and convincing evidence. This burden of proof is difficult. It has been described as not necessarily implying an act accompanied by force, Nichols, supra, but nevertheless it is substantial and not easily achieved.
In reviewing the record we cannot state that the acts of Griffin, which were consistent with the legal right of a cotenant upon the land, are the equivalent of actual knowledge on the part of the other cotenants so that the statute of limitations would begin to run. We conclude, therefore, that Griffin did not meet the burden of proof imposed upon him, and having failed so to do, the case must be reversed and remanded for an accounting between the parties.
Reversed and remanded.
GILLESPIE, P.J., and RODGERS, SMITH and ROBERTSON, JJ., concur.

ON PETITIONS FOR REHEARING
RODGERS, Justice.
Upon consideration and careful study of the briefs on Petitions for Rehearing, we have concluded that the rule concerning ouster of cotenants should be reappraised. The original opinion in this case recognized the unstable state of the law in this respect. The decisions resulting in this state of the law, as well as those resulting from the law as it now prevails, are discussed in our original opinion. These will not be repeated.
Until the decision in Nichols v. Gaddis and McLaurin, Inc., 222 Miss. 207, 75 So.2d 625 (1954), the rule in this state was that one tenant in common could not acquire title by adverse possession against his cotenants *811 until they had actual notice of the adverse claim or knowledge of such facts as were tantamount thereto. Nevertheless, when one tenant in common placed a deed on the deed records of the county where the land lay purporting to convey to him the land in fee simple, such deed constituted an ouster of cotenants who did not join in the deed. The recorded deed was as effectual for setting the statute in motion as actual notice would have been, and thereafter, upon termination of the statutory period, title was vested in such adverse possessor. Peeples v. Boykin, 132 Miss. 359, 96 So. 177 (1923). It had been applied in the earlier case of Eastman, Gardiner v. Hinton, 86 Miss. 604, 38 So. 779 (1905), and in the later case of Davis v. Gulf Refining Co., 202 Miss. 808, 32 So.2d 133 (1948). The Peeples v. Boykin rule also was, and is, the general rule in other jurisdictions. Annot. 32 A.L.R.2d 1216 (1953).
Since the overruling of Peeples v. Boykin, supra, in Nichols v. Gaddis and McLaurin, Inc., supra, there is no limit on the time within which a missing heir can claim an interest in land. This has unquestionably made the validity of land titles more unstable, and the contradictions and confusion in the opinions of the Court add to this unsettling situation. There is need for stability, predictability, and simplicity in the law involving land titles.
In Caruth v. Gillespie, 109 Miss. 679, 68 So. 927 (1915), where the Court applied the fiction of a presumed grant from the state so as to vest title in one in possession of land, this Court emphasized the need for repose in the matter of land titles, saying:
"Laws and judicial tribunals are established for defining and settling rights, so that order and tranquillity may prevail in the community. The policy of the law favors the repose of society, and hence it makes due allowances for the frailties of human memorials, and the difficulties in establishing perpetual evidences of the transactions of men. When so long a time has elapsed that certainty in the proof of events cannot be expected, it receives as a substitute that which is less certain in order to protect apparent right. A contrary policy is not to be tolerated. It would convert the law into an engine to work incalculable mischief. Instead of giving repose to society, it would be the means of promoting contention and strife which would often terminate in injustice." (109 Miss. at 685, 68 So. at 929)
We are of the opinion that some modification of Nichols v. Gaddis and McLaurin, Inc., supra, is appropriate. It is overruled only as to that part of the opinion overruling Peeples v. Boykin, supra. We are of the opinion that in the interest of stability, justice and simplicity of the law in this area the rule should be, and is hereby declared to be, as follows: Where one or more of several cotenants convey land by an instrument purporting to vest in the grantee the fee simple title to the entire property, and the grantee is not a cotenant at the time of the execution of the deed, and the grantee records his deed in the county where the land lies, and enters into possession asserting open and exclusive ownership thereof, the cotenants not participating in the conveyance are deemed to be ousted and on the termination of the statutory period, title by adverse possession becomes vested in the grantee. In order for such deed to constitute an ouster as aforesaid, the grantee must have had no interest whatever in the land prior to the execution of the deed, either as a cotenant by deed or as a cotenant by inheritance; nor is a quitclaim deed limiting the estate conveyed to "all my right, title and interest" in the land sufficient to set in motion the statute because it does not purport to convey the entire property. Hurst v. J.M. Griffin & Sons, Inc., 209 Miss. 381, 46 So.2d 440, 47 So.2d 811 (1950).
*812 To oust the cotenants not joining in the deed these factors must concur, (1) the execution of the deed purporting to convey the entire interest in fee simple to one then a stranger to the title, (2) the recording of the deed, and (3) the entry of the grantee claiming the entire interest in the property.
The real problem in administering the law since Peeples v. Boykin, supra, was overruled, from the standpoint of litigants, attorneys, and the courts, involves the ouster of the cotenant not joining in the deed. Under Peeples v. Boykin, supra, this necessary fact was provable by the traditional objective standards of the law, by proving the deed, its recordation, and entry of the grantee claiming the entire interest in the property. Since Peeples v. Boykin, supra, was overruled, the objective standard is abandoned and instead proof must be made as to what the "missing heir" knew, or the equivalent thereof (whatever that is), which is a subjective standard.
The rule we now adopt should be simple to administer; it is consistent with the policy of both the legislature and the Court that the repose of society is favored. We also are of the opinion that it will promote the plainest principles of justice. A cotenant will have the same protection as a sole owner as far as adverse possession is concerned.
The next question before us is whether the rule we here adopt should result in sustaining the Petitions for Rehearing. In our opinion, and in view of the particular facts, circumstances and posture of this case, the Petitions for Rehearing should be, and are, denied.
Petitions for rehearing denied.
All Justices concur, except ETHRIDGE, C.J., who took no part, PATTERSON, J., who concurs in part and dissents in part, and SMITH, J., who concurs in denying the petitions for rehearing but otherwise dissents.
PATTERSON, Justice (concurring in part and dissenting in part):
I concur in denying the petitions for rehearing. I agree that the rule announced in the concurring opinion probably establishes the best rule to be followed in cases of this nature. However, I dissent therefrom since I doubt the authority of the Court to announce this rule prospectively, and in so doing overrule in part Nichols v. Gaddis and McLaurin, Inc., 222 Miss. 207, 75 So.2d 625 (1954).
SMITH, Justice (concurring in part and dissenting in part):
I would overrule the Petitions for Rehearing. I am convinced that the rule announced in Nichols v. Gaddis and McLaurin, Inc., 222 Miss. 207, 75 So.2d 625 (1954), is sound and should be adhered to. Peeples v. Boykin, 132 Miss. 359, 96 So. 177 (1923), was properly overruled, I think, after careful deliberation. The principle laid down in Nichols v. Gaddis and McLaurin, supra, has stood for some fifteen (15) years and should not be changed to reach a result seemingly desirable in this particular case.